[Cite as *In re K.K.*, 2024-Ohio-2595.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

IN RE:                                          :

    K.K., et al.                          :          CASE NOS. CA2023-03-025
                                          CA2023-03-026
                              :          CA2023-03-027

                              :          O P I N I O N
                                          7/8/2024

                              :

                              :

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2022-0314; JN2022-0315; JN2022-0317

Billy W. Guinigundo, for appellant, father.

Jeannine C. Barbeau, for appellee, mother.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee, Butler County Department of Job & Family Services.

Nicole Stephenson, guardian ad litem

      **BYRNE, J.**

    {¶ 1}  Father appeals from decisions of the Butler County Court of Common

Pleas, Juvenile Division, which found Father's three minor children to be "dependent" children under R.C. 2151.04.  We affirm the juvenile court decisions.

## I. Factual and Procedural Background

### A. The Complaints

{¶ 2}   According to the briefs filed in this case, on March 31, 2022, the Butler County Department of Job and Family Services, Children Services Division ("the agency") filed complaints alleging that Father's three minor children were dependent children.  After the filing of the initial complaints, the juvenile court placed the children in the agency's temporary custody.  Following a contested shelter care hearing in April 2022, the court placed the children in Mother's temporary custody.  The complaints were refiled a second time in June 2022 and another contested shelter care hearing was held in August 2022.

{¶ 3}   The agency refiled the complaints for the third time in September 2022, which complaints form the basis of the decisions appealed from in this appeal.  The refiled complaints alleged that Father's three minor children were dependent children under R.C. 2151.04.  That statute's subsections provide four alternative definitions of "dependent child."  The agency's complaint specifically alleged that the three children were dependent children under the (D) subsection of R.C. 2151.04.  That subsection provides that a "dependent child" is a child

> (D)   To whom *both* of the following apply:
>
> (1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the *household is an abused, neglected, or dependent child.* [and]

(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household.

(Emphasis added.) R.C. 2151.04(D)(1) and (2).

{¶ 4} The refiled complaints alleged that on March 30, 2022 (that is, the day before the first complaints were filed), the agency received a referral that one of Father's children, "Carrie,"[1] had visible marks on her neck as the result of Carrie intervening in a domestic violence incident between Father and the children's mother ("Mother"). The complaints alleged that the other two children, "Katherine" and "Walt," were present during this incident.

{¶ 5} The complaints explained that Mother and Father had shared parenting of the children, and that on the evening of March 29, 2022, Mother was at Father's home in violation of an existing protection order. The complaints stated that both Mother and Father had regularly violated the protection order and there had been domestic violence issues between Mother and Father for years.

{¶ 6} The complaints further alleged that Father refused to speak to the agency or the police regarding the incident and would not answer the door. However, the complaints alleged that Father "later" admitted to grabbing Mother and pulling her down the stairs in front of the children. In addition, Father allegedly admitted to pushing Carrie and breaking "another child's" cell phone during the incident. The

---

1. We use pseudonyms to refer to the minor children, to preserve their privacy and for purposes of readability. *See In re A.P.*, 2022-Ohio-3181, ¶ 2, fn.1 (12th Dist.).

complaints alleged that Mother had advised the Hamilton Police that she did not want to press charges against Father for either herself or Carrie in connection with the March 29 incident, but that the Hamilton Police had advised the agency they would be filing domestic violence and child endangering charges against Father as a result of the incident. The complaints requested that the court grant temporary custody of the three children to the agency.

### B. Adjudication Hearing

{¶ 7} A juvenile court magistrate held an adjudication hearing in October 2022. At the beginning of the hearing, the agency requested to modify the complaints with respect to all three children to assert that the agency was alleging dependency under R.C. 2151.04(C), rather than under R.C. 2151.04(D)(1) and (2) as previously indicated. R.C. 2151.04(C) provides that a child is dependent if the child's "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." No parties objected to this modification, and the court granted the request.

{¶ 8} For its case, the agency called Father as if upon cross-examination. Father agreed with the state's characterization that on the evening of March 29, 2022, Mother had come to his house because of "something to do with money." Father also agreed that during the incident between he and Mother, he broke the cell phone used by Katherine—though he qualified this statement by explaining that the phone was his property, not Katherine's. Father admitted that Katherine could have been video recording the incident between he and Mother, but he denied he broke the phone because Katherine was recording. Father explained that he instead broke Katherine's

phone because she was "interjecting" herself in the "situation."

{¶ 9} Regarding the allegation that he dragged Mother down the stairs, Father declined to testify, pleading the Fifth Amendment right against self-incrimination. However, he later admitted to holding Mother "up" while walking her down the stairs. Specifically, he testified that he was "holding" her, but he denied "pulling" her. At that time, he admitted, he "might" have turned around and pushed Carrie. And he admitted it was a "possibility" that he shoved Carrie to the ground.

{¶ 10} The children's guardian ad litem called Mother to provide direct testimony. Mother testified that Father dragged her down the stairs, and then Carrie came and intervened and "body pushed" Father off Mother. Then, according to Mother, Father lifted Carrie into the air. When presented with a photograph depicting Carrie's neck, Mother identified scratches on Carrie's neck and stated that the scratches were not present prior to the March 29 incident with Father.

{¶ 11} Mother further testified that Father physically dragged her out of the home that evening. She stated that Father had perpetrated verbal abuse against her "for years." Regarding the ongoing fighting between herself and Father, Mother stated that they typically sent the children to their rooms when they had "issues," but she was sure the children "heard it."

{¶ 12} At the conclusion of the adjudication hearing, the parties presented closing arguments. As part of his closing argument, Father's attorney cited this court's precedent in *In re A.V.*, 2021-Ohio-3873 (12th Dist.). Father argued that the agency failed to submit clear and convincing evidence that the children were negatively impacted by the incident that occurred in the home on March 29, and therefore,

pursuant to *A.V.*, the court should not find the children dependent.

### C. Magistrate's Adjudication Decision

{¶ 13} On October 4, 2022, the magistrate issued an adjudication decision. Because some of Father's arguments discussed below concern certain of the magistrate's factual findings with which Father disagrees, we now quote from the magistrate's factual findings in the adjudication decision at length:

> 6. Father removed mother from the home by physically carrying or dragging her down the steps and out of the door to his residence . . .
>
> 7. Father did not call the police at any time to report that mother had violated the restraining order.
>
> 8. While he was dragging or carrying mother out of the home, one of the children, [Carrie], attacked father in an apparent effort to separate father and mother.
>
> 9. At some point, father shoved or pushed [Carrie], eventually picking her up by the neck causing injury to her. Father denied doing this, but mother's testimony and photographic evidence clearly contradict his denial.
>
> 10. At some point, [Carrie] retrieved a knife from the kitchen and attempted to attack Father.
>
> 11. After father had successfully removed mother from the home, father took a cell phone, ordinarily used by and in the possession of [Katherine], from [Katherine] and destroyed it.

{¶ 14} The magistrate went on to analyze the case and specifically addressed this court's decision in *A.V.* The magistrate distinguished *A.V.*, finding that in that case, unlike this one, there was no evidence presented that the children were harmed as a result of their parents' conduct. The magistrate then concluded that, based on its factual findings and its analysis of *A.V.* as distinguishable, the agency demonstrated

- 6 -

"by clear and convincing evidence" that the children were dependent under R.C. 2151.04.

### D. Objections to Magistrate's Decision, Additional Evidence, and Decision Overruling Objections

{¶ 15} Father timely objected to the Magistrate's adjudication decision. Relevant to this appeal, Father argued that the magistrate erred in finding clear and convincing evidence that the children were dependent. Father contended that the agency failed to satisfy its burden and that the magistrate improperly analyzed the issue of adverse impact pursuant to *A.V.*

{¶ 16} In December 2022, before the juvenile court had ruled on Father's objections to the magistrate's decision, Father moved for the admission of additional evidence. Father proffered a USB drive containing three digital video files. Father stated that he was submitting the video evidence to "rebut the erroneous testimony of [Mother]."

{¶ 17} On February 6, 2023, the juvenile court issued its decision on Father's objections to the magistrate's decision. Initially, the court addressed Father's motion to admit the three digital video files. The court noted that based on the lack of any opposition to Father's motion, the court viewed the video files in considering Father's objections and marked them as exhibits. The court described the content of the videos as follows:

- All three video clips were dated March 29, 2022 and were less than 1 minute in length. The first video began at approximately 8:15 p.m. The second video began at approximately 9:44 p.m. The third video began at approximately 10:29 p.m. None of the videos has audio.

- The first video appears to show Mother entering the front

door of the house and Mother and Father talking in the family room area.

- The second video appeared to show Father dragging Mother down the stairs to the area at the bottom of the stairs. Mother's sweatshirt came off during the process. What appears to be one of the children is observed pushing Father in the back while he has a hold of Mother while Mother is on the floor at the bottom of the stairs. The push to Father's back appears to be a slight push that did not warrant Father's reaction. Father's reaction was to swing his left arm back where it appeared it could have struck the child in the area of her neck. He immediately pushed the child to the ground. The child got up from the ground on her own and was not pulled up by her neck. What is important to note is that this occurred approximately an hour and a half after Mother arrived.

- The third video showed Father grabbing a cellphone and slamming it to the ground.

- Video's two and three were not helpful to Father's case. Even though the videos may not show everything that is mentioned in the Magistrates decision, what they do show illustrates the Magistrate was correct in his decision. It is important to note that the time stamps on the videos cover a span of almost 2 hours and 15 minutes, yet less than a few minutes of video was provided as evidence.

{¶ 18} The court thereafter stated that it was in the "best interest" of the children to overrule Father's objections to the magistrate's adjudication decision. The court also overruled Father's objections to an October 12, 2022 disposition decision. Father objected to that disposition decision but did not raise any specific issues regarding disposition, and instead focused his argument solely on the adjudication. In that disposition decision, the court continued the temporary orders in place and adopted the agency's case plan.

{¶ 19} Father appealed, raising one assignment of error.

**II. Law and Analysis**

**A. Jurisdiction to Hear Appeal**

{¶ 20} Before we address Father's argument on appeal, we will address a jurisdictional issue raised by the agency in its brief. The agency contends that Father did not timely file his notice of appeal.

{¶ 21} The agency points out that on February 6, 2023, the juvenile court overruled Father's objections to the magistrate's October 4, 2022 adjudication decision and the magistrate's October 12, 2022 disposition decision. The agency argues that Father had 30 days from the court's February 6, 2023 decision to notice his appeal of the adjudication decision. (Father did not appeal the disposition decision.) That is, the agency argues that Father had until March 8, 2023, to appeal the court's February 6, 2023 decision adopting the adjudication decision. The agency states that Father did not file his notice of appeal until March 15, 2023, making that appeal untimely.

{¶ 22} Our review of the record indicates the following. The magistrate issued his adjudication decision finding the children dependent on October 4, 2022. On October 11, 2022, Father objected to the adjudication decision. On October 12, 2022, the magistrate held a dispositional hearing, and the magistrate issued his disposition decision the same day. On October 20, 2022, Father objected to the magistrate's October 12 disposition decision. On December 12, 2022, the court held a hearing on Father's objections. The court issued an entry the same day as the hearing, indicating that it was taking Father's objections under advisement and would issue a decision.

{¶ 23} On February 6, 2023, the court filed its decisions overruling Father's objections to the October 4, 2022 adjudication decision and the October 12, 2022

disposition decision. On February 10, 2023, the court, through its magistrate, held a second dispositional hearing. The magistrate issued a new disposition decision the same day that recommended adopting a case plan filed prior to the hearing and continuing all previously issued orders in the case. On February 13, 2023, after an independent review, the court adopted the magistrate's February 10, 2023 disposition decision. Father did not object to the February 10, 2023 magistrate's disposition decision.

{¶ 24} On February 21, 2023, Father filed a notice of appeal with the juvenile court. The time stamp indicates the document was filed "In Juvenile Court Butler County, Ohio." In that notice of appeal, Father indicated that he was appealing the "judgment of the Butler County Court of Common Pleas, Juvenile Division, entered on the 10th day of February, 2023." The only judgment entered on that day was the magistrate's updated disposition decision. But in the civil docketing statement filed with his notice of appeal, Father indicated that the general nature of the appeal involved juvenile/permanent custody and specifically "Depe[n]dency of Child." Father indicated that the probable issue for review was "Failure to present clear and convincing evidence of actual adverse impact of parental acts; improper call of BIO FATHER as if on cross-examination." Though these statements in the civil docketing statement referred to the adjudication decision, Father attached a copy of the magistrate's February 10, 2023 disposition decision to his notice of appeal.

{¶ 25} Duplicates of the February 21, 2023 notice of appeal and docketing statement were filed in this court on March 15, 2023. The duplicate notice of appeal bore the February 21, 2023 time stamp from the juvenile court clerk.

{¶ 26} Contrary to the agency's argument, Father timely filed his notice of appeal with the juvenile court clerk on February 21, 2023, pursuant to App.R. 3(A). That appellate rule provides that "An appeal as of right shall be taken by filing a notice of appeal with the clerk of *the trial court* within the time allowed by Rule 4." (Emphasis added.) App.R. 3(A). The March 15, 2023 notice of appeal filed in the court of appeals and referenced by the agency was a duplicate of the February 21, 2023 notice of appeal filed with the juvenile court clerk. It appears the February 21, 2023 notice of appeal filed in the juvenile court was simply refiled in the appeal, resulting in the later March 15, 2023 time stamp. Accordingly, Father's notice of appeal of the adjudication decision was filed with the juvenile court clerk as required by App.R. 3(A) and was timely.

{¶ 27} The state also argues that Father attached the wrong order to his notice of appeal. The record does reflect that Father attached the February 10, 2023 disposition decision to his notice of appeal, rather than the October 4, 2022 adjudication decision or the February 6, 2023 decision of the court overruling Father's objections to that magistrate's adjudication decision, which are the subjects of Father's appeal.

{¶ 28} App.R. 3(D) governs the content of the notice of appeal. The rule provides in relevant part that "The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or part thereof [appealed] from; and shall name the court to which the appeal is taken." The question thus becomes whether Father's notice of appeal is defective because he indicated he was appealing from a different order than he intended to appeal, and incorrectly attached that

document to the notice of appeal.

{¶ 29} In *Maritime Mfrs. Inc. v. Hi-Skipper Marina*, 70 Ohio St.2d 257 (1982), the Ohio Supreme Court held that "the law favors and protects the right of appeal and [] a liberal construction of the rules [including App.R. 3(D)] is required in order to promote" the right to appeal "and to assist the parties in obtaining justice." *Id.* at 258. The court held that the appellate rules are to be construed in light of the purpose to which they are to serve. *Id.* at 259. That purpose is to apprise the opposite party of the taking of an appeal. *Id.* If this is accomplished, beyond the "'danger of reasonable misunderstanding, the purpose of the notice of appeal is accomplished.'" *Id.* at 259, quoting *Couk v. Ocean Accident & Guar. Corp. Ltd.*, 138 Ohio St. 110, 116 (1941). And the Ohio Supreme Court concluded that if the other party had notice of what was actually being appealed and was not prejudiced thereby, the reviewing court maintains jurisdiction to review the judgment intended to be appealed because the mistake of attaching the wrong order or judgment was harmless error. *Id.* at 260.

{¶ 30} Here, the notice of appeal mistakenly referred to and attached the February 10, 2023 disposition decision as the order being appealed from. But in the civil docketing statement that Father filed with his notice of appeal, Father identified the "general nature of case" as being "Depe[n]dency of Child." Father specified that the "probable issue for review" by the appellate court was "Failure to present clear and convincing evidence of actual adverse impact of parental acts; improper call of BIO Father as if on cross-examination."[2] Thus the civil docketing statement

---

2. In his appellate briefing, Father only contested the finding of dependency and did not raise the issue of whether the state improperly cross-examined him on his testimony in the shelter care hearing.

information reflected an intention by Father to challenge the trial court's adjudication of dependency. The agency was aware of this and was not prejudiced as evidenced by the secondary argument in its brief, namely, that the trial court's dependency finding was supported by clear and convincing evidence and should be affirmed on the merits.

{¶ 31} Based on the Ohio Supreme Court's decision in *Maritime Mfrs.*, in this case, Father's failure to strictly comply with the requirements of App.R. 3(D) does not require this court to dismiss Father's appeal. *Maritime Mfrs.*, 70 Ohio St.2d at 258.

## B. The Finding of Dependency

{¶ 32} Having addressed the jurisdictional issue raised by the state, we now turn to Father's sole assignment of error, which states:

> THE COURT ERRED WHEN IT FOUND CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN WERE DEPENDENT PURSUANT TO R.C. 2151.04(C) T.d. 17 and T.d. 41.

{¶ 33} Father contends that the juvenile court's dependency finding was not supported by clear and convincing evidence and cites this court's opinion in *A.V.* in support. Father argues that the agency failed to prove that his conduct had an adverse impact on the children and that Mother's testimony lacked credibility.

### 1. Applicable Law, Burden of Proof, and Standard of Review

{¶ 34} "The determination that a child is dependent under R.C. 2151.04(C) focuses on the child's condition or environment, and not on the parent's fault." *A.V.*, 2021-Ohio-3873 at ¶ 22, citing *In re Riddle*, 79 Ohio St.3d 259, 263 (1997); *In re M.W.*, 2021-Ohio-1129, ¶ 13 (12th Dist.). A finding of dependency under R.C. 2151.04(C) requires evidence of "conditions or environmental elements adverse to the normal development of the child." *M.W.* at ¶13.

{¶ 35} "[A]ctual harm to a child is not necessary. Rather, circumstances giving rise to a legitimate risk of harm may suffice to support an adjudication of dependency under R.C. 2151.04(C)." *In re N.J.*, 2017-Ohio-7466, ¶ 20 (12th Dist.). A court may consider a parent's conduct under R.C. 2151.04(C) "solely insofar as that parent's conduct forms a part of the environment of [the] child." *In re Burrell*, 58 Ohio St.2d 37, 39 (1979). "As a part of the child's environment such conduct is only significant if it can be demonstrated to have an adverse impact upon the child sufficiently to warrant state intervention." *Id.* "That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner." *Id.*

{¶ 36} "The state bears the burden of proof of establishing that a child is abused, neglected, or dependent." *In re L.H.*, 2019-Ohio-2383, ¶ 20 (12th Dist.). "A juvenile court's determination that a child is dependent must be supported by clear and convincing evidence." *A.V.* at ¶ 20, citing R.C. 2151.35(A); *In re T.B.*, 2015-Ohio-2580, ¶ 12 (12th Dist.). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.*

## 2. Analysis

{¶ 37} After a thorough review of the record, we find that the juvenile court's adjudication of the children as dependent under R.C. 2151.04(C) was supported by sufficient clear and convincing evidence that the children's condition or environment

was such as to warrant the state in assuming their temporary custody.

{¶ 38} There was sufficient evidence presented at the adjudication hearing to establish that all three children were present in the home during a domestic violence incident between Mother and Father. Mother's testimony was sufficient to establish that during that incident, Father dragged Mother down a flight of stairs. Mother's testimony was also sufficient to establish that Carrie attempted to prevent Father from harming Mother by grabbing at Father's back, and that Father responded by striking at Carrie with his arm and then lifting her into the air by the neck. Finally, Father's own testimony was sufficient to establish that he broke Katherine's phone.[3] All of this testimony was sufficient to establish that Father acted in a violent manner towards Mother and Carrie, at a minimum.

{¶ 39} It is reasonable to conclude that Father's admission that he was "holding" Mother while "walking" her down the stairs was his way of putting a self-serving positive spin on Mother's description of Father as dragging her down the stairs.[4] Likewise, Father's admission that he "might" have pushed Carrie and that there was a "possibility" that he shoved Carrie to the ground was consistent with

---

3. During his testimony, Father repeatedly emphasized that while Katherine was the person who normally used the phone, the phone was his personal property, not Katherine's. He suggested that he was therefore free to destroy his own personal property. This may be true as a matter of property law, but Father misses the point. The point is not who owned the phone or who had the right to dispose of it, but Father's behavior in taking the phone from Katherine and violently destroying it in front of her, in anger. As we understand it, the magistrate essentially found that Father's violent behavior in destroying the phone underscored his other violent behavior towards Mother and Carrie on the evening of March 29, 2022. We agree. Our conclusion on this point should not be taken to suggest that a parent is in any way lawfully prohibited from restricting a child's use of a cell phone or even destroying that phone; rather, our conclusion focuses on Father's violent behavior.

4. The video shows that Father dragged Mother down the stairs with sufficient roughness that her sweatshirt was removed from her body in the process. The video therefore undermines Father's effort to characterize himself as merely "holding" Mother while he "walked," rather than "pulled," her down the stairs. Sweatshirts do not magically remove themselves from a person's body because someone else "held" them while "walking" them down the stairs.

Mother's description of his violent behavior towards Carrie.

{¶ 40} We have reviewed the proffered digital videos and agree with the juvenile court's assessment of them as not being helpful to Father's case. One video depicts Father physically assaulting Mother and Carrie. Another video depicts Father violently destroying Katherine's phone by slamming it to the ground while the family was nearby. Father apparently submitted these videos because certain details shown in the videos differ slightly from the magistrate's findings of fact. For example, one of the videos shows Father shoving Carrie to the ground during the incident, rather than picking her up by her neck. Another video shows Mother voluntarily leaving the home, rather than showing her being physically removed from the home by Father. And the third shows Father destroying Katherine's phone when Mother was present, rather than destroying it after Mother left the home as the magistrate indicated. But while Father is correct that there are certain differences between the events depicted in the videos and the magistrate's findings of fact regarding those events, those differences are insignificant in the overall context of what happened on the evening of March 29 and the videos do not in any way present Father in a more favorable light. To the contrary, the videos depict extremely concerning behavior by Father and bolstered the case for finding the children dependent. Furthermore, while the videos do not depict Father lifting Carrie up by the neck, the absence of this particular action from the videos does not mean it did not occur outside the periods of time covered by the videos. Nor did the absence of this incident from the videos require the magistrate to ignore Mother's testimony that Father lifted Carrie up by the neck. This is particularly true when there was photographic evidence of scratches or red marks on Carrie's

neck taken soon after the incident. Therefore, while the testimony presented at the adjudication hearing was sufficient for the magistrate and court to conclude that Father acted in a violent manner toward Mother and two of his children on the evening at issue, the videos proffered by Father after the hearing were consistent with this conclusion and do not require us to reverse the dependency adjudication.

{¶ 41} Father argues that the finding of dependency in this case conflicts with the rationale set forth in *A.V.*, 2021-Ohio-3873. In *A.V.*, this court reversed a juvenile court's dependency finding after concluding that the state failed to prove by clear and convincing evidence that the parents' drug use had an adverse impact upon the children. In so holding, this court stated:

> We recognize that a parent's drug use may or can result in environmental risks to his or her children. However, to warrant state intervention under R.C. 2151.04(C), a negative consequence must be shown "to have an adverse impact upon the child[.] That impact cannot be simply inferred in general, but must be specifically demonstrated in clear and convincing manner." *In re Burrell*, 58 Ohio St.2d at 39. Such was not the case here as the record is devoid of any evidence demonstrating that Mother's and Father's drug use had an adverse impact on their children. Without some evidence that the children's environment has been affected in some negative way by Mother's and Father's drug use, there is no clear and convincing evidence of dependency.

*Id.* at ¶ 28.

{¶ 42} Father argues that the mere fact that he acted as he did, as testified to by Mother and as seen in the videos, was not, in and of itself, sufficient to demonstrate clear and convincing evidence that his conduct had any adverse impact on the children. Father contends that there was no evidence presented as to how Father's conduct affected the children, such as testimony from the children themselves or testimony from a caseworker or teacher.

{¶ 43} We find *A.V.* distinguishable. In *A.V.*, there was no evidence presented of harm to the children's environment because of the parents' drug use. In fact, there was no evidence that the parents ever used drugs in the children's presence, no evidence the parents were ever under the influence of drugs in the children's presence, and no evidence the children were even aware that their parents used drugs. *A.V.* at ¶ 26. Here, however, there was direct evidence of Father physically assaulting one child and violently destroying another child's phone in the children's presence during or shortly after Father's acts of violence. In addition, Father physically assaulted the children's Mother in the children's presence. The children would have suffered harm simply from witnessing their Mother being harmed by Father and this is evident based on the children's body language in the videos and Carrie's effort to physically stop her Father. As such, the court was presented with evidence demonstrating how Father's conduct negatively affected the children's safety while under his care.

{¶ 44} Father also argues that there was no evidence suggesting that Walt was harmed by his actions. However, as stated above, "[A]ctual harm to a child is not necessary. Rather, circumstances giving rise to a legitimate risk of harm may suffice to support an adjudication of dependency under R.C. 2151.04(C)." *N.J.*, 2017-Ohio-7466 at ¶ 20. The fact that Father assaulted one child was sufficient to demonstrate that Walt was in an environment adverse to his development. *M.W.*, 2021-Ohio-1129 at ¶13. The agency was not required to wait until something happened to Walt in order to demonstrate that he was at risk. *See In re Pieper Children*, 85 Ohio App. 3d 318, 327 (12th Dist.1993) ("A finding of dependency pursuant to R.C. 2151.04[C] is justified

as the potentially abusive environment to which these children would otherwise be subject warrants the state, in the interests of these children, in assuming their guardianship").

{¶ 45} For these reasons, we find no error in the court's determination that the children were dependent. We overrule Father's sole assignment of error.

{¶ 46} Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.